PER CURIAM.
G.B. (“the father”), the father of K.B. (“the child”), a minor, appeals from a judgment entered by the Clarke Circuit Court determining his child-support obligation on the basis of imputed income. The father claims that the circuit court erred in imputing income of $500 per week to him. The father also claims that the circuit court erred in omitting a visitation agreement from the judgment. We affirm' in part, reverse in part, and remand with instructions.
*572 In April 2003, the State of Alabama, acting on behalf of J.H. (“the mother”), the mother of the child, petitioned the Clarke Juvenile Court to order the father to pay child support. The father requested genetic testing to verify his paternity. The genetic testing indicated that the cumulative probability of his' paternity was 99.99%. The mother filed a CS-41 income affidavit stating that her income was $600. per month. The father filed a CS-41 income affidavit stating that his income was $252.16 per month.
Following an ore tenus proceeding, the juvenile court completed a CS-42 form in which it imputed to the father income of $26,000 per year and calculated his child-support obligation under the Rule 32, Ala. R. Jud. Admin., guidelines at $319 per month. The juvenile court then entered a judgment establishing the father’s paternity of the child, ordering the father to pay $319 per month in current child support, and ordering the father to pay retroactive child support in the amount of $3,828 at the rate of $50 per month.
The father timely appealed from the juvenile court’s judgment to the Clarke Circuit Court (see Rule 28(B), Ala. R. Juv. P.) and, thereafter, moved the circuit court for visitation with the child. The mother filed a CS-41 income affidavit in the circuit court stating that her income was $600 per month. The father filed a CS^ll income affidavit in the circuit court stating that his income was $581 per month.
The circuit court set an evidentiary hearing for June 8, 2004. At the beginning of that hearing, this exchange occurred on the record:
“[Counsel for the father]: Your Hon- or, the parties have reached an agreement concerning visitation with the minor child ... and [the father]. And it’s agreed that [the father] will have visitation with the [child] every other week-' end beginning next weekend. Two two-week periods in the summer, to be agreed upon in advance by the parties, and every other spring break beginning 2005. Every other Thanksgiving from Wednesday at 5:00 to Friday at 5:00 beginning 2005. On [the] child’s birthday, he will have time with the child on [her] birthday and Father’s Day visitation ... each year. There will be permission for telephonic visitation. He will receive one week at Christmas from [December] 25 at 3:00 p.m. to January 1st at 3:00 p.m. on odd years. On even years, visitation from [December] 18 at 3:00 p.m. until [December] 25 at 3:00 p.m. He will have visitation at all times and places agreed upon in advance. And they will meet at the Econ in Grove Hill — Exxon, excuse me.
“THE COURT: Let me ask [the mother] ... did you understand the stipulation for visitation you have entered into with [the father]?
“[The mother]: Yes, I have.
“THE COURT: Is that, in fact, your agreement?
“[The mother]: Yes, it is.
“THE COURT: [to the father] [D]id you understand the stipulation?
“[The father]: Yes.
“THE COURT: And is that, in fact, the agreement?
“[The father]: Yes.
“THE COURT: Thank you. That will be established as the visitation schedule.”
After the father had stipulated to his paternity of the child, the parties introduced evidence pertaining to the issue of the father’s child-support obligation. The mother testified that she earned $600 per month working for the Clarke County Board of Education as a custodial worker. She testified that she and the father had *573 lived together for three years before they separated in July 2002. The mother’s testimony in the record indicates that between 1999 and 2002, when the parties had lived together, the father had “worked consistently” and had had the means to leave her a “series of checks” that could be used to defray the costs of her needs, the needs of her two children, or household needs. The record also shows that the father had also purchased “every television” in the mother’s home, purchased fans and an air conditioner for the mother’s home, and paid for Internet service for the mother’s home.
The 44-year-old father, who apparently has no significant health problems, testified that he had formed a corporation in 1995 and that, since then, he had earned his living by working as the sole employee of this corporation. He is also the sole shareholder of this corporation. He testified that, during the year 2003, he had paid himself $581 per month from the revenues of the corporation. When asked if he remembered having testified in the juvenile-court hearing that he made $500 per week after payment of his expenses, he responded in the negative.
Since he incorporated his business in 1995, the father has engaged in “bush hogging” (ie., mowing),[1] landscaping, and trucking. The corporation still owns the tractor, “bush hog” mower, computer, large freight truck, and pick-up truck that the father used in his “bush-hogging” and landscaping business. However, since the father separated from the mother, he has primarily engaged in trucking and has not regularly performed “bush-hogging” or landscaping jobs. The corporation owes no debt on its tractor, “bush hog,” pick-up truck, or the large freight truck the father uses in his trucking business.
The father lives with his parents and works out of their home, voluntarily paying them $75 per month toward utility expenses. He claimed monthly expenses of $125 for food and $50 for repayment of a department-store credit card. The father testified that although he had paid himself no more than $6,972 from the revenues of the corporation in 2003, the corporation nevertheless sustained a net loss of $1,714 that year. However, the father admitted that although he received all of his corporation’s revenues and paid all of its expenses, he did not know how much the corporation had received in revenues or how much it paid in expenses. He testified that the corporation pays the charges on 6 to 10 credit cards issued to either the father or to the corporation, although he claimed that all of the charges on those cards were for expenses of the corporation.
On September 2, 2004, the circuit court entered a judgment. The judgment contained the following pertinent provisions:
“2.... [The father’s] income is hereby imputed at $500.00 per week.
“3.... [The father] shall pay $319.00 per month current child support, effective June 8, 2004, as per Rule 32[, Ala. R. Jud. Admin.]
“4.... [The father] is ORDERED to reimburse retroactive child support in the amount of $3,828.00 ... to be liquidated at the rate of $50.00 per month, effective June 8, 2004.”
The judgment did not, however, incorporate the parties’ agreement regarding visitation or otherwise provide for visitation in any respect.

*574
Child Support

On appeal to this court, the father first argues that in determining the amount of child support to be paid to the mother, the circuit court erred in imputing income to him without expressly finding that he was voluntarily underemployed. Rule 32(B)(5), Ala. R. Jud. Admin., provides, in pertinent part:
“If the court finds that either parent is voluntarily unemployed or underemployed, it shall estimate the income that parent would otherwise have and shall impute to that parent that income; the court shall calculate child support based on that parent’s imputed income. In determining the amount of income to be imputed to a parent who is unemployed or underemployed, the court should determine the employment potential and probable earning level of that parent, based on that parent’s recent work history, education, and occupational qualifications, and on the prevailing job opportunities and earning levels in the community.”
A trial court may validly impute income to a parent pursuant to Rule 32(B)(5) without expressly finding that the parent is voluntarily unemployed or underemployed. In Berryhill v. Reeves, 705 So.2d 505, 507 (Ala.Civ.App.1997), the trial court imputed income to the father without expressly finding that he was voluntarily unemployed or underemployed. This court stated:
“Under Rule 32(B)(5), Ala. R. Jud. Admin., a trial court must impute income to a parent and calculate his or her child support obligation based upon that parent’s potential income if ‘the court finds that [the] parent is voluntarily unemployed or underemployed.’ While the trial court’s judgment sets forth no express findings of fact concerning this issue, it is well settled that where the trial court does not make specific factual findings, this court will assume that the trial court made such findings as would support its judgment. Transamerica Com. Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992).”
(Emphasis added.) Accord, Turner v. Turner, 745 So.2d 880, 883 (Ala.Civ.App.1999) (“The trial court did not make the explicit finding that the husband was voluntarily unemployed or underemployed. However, we conclude that such a finding is implicit in the language of the trial court’s judgment [imputing income to the husband].”). Accordingly, we cannot reverse the circuit court’s imputation of income to the father on the ground that the circuit court did not expressly find that he was voluntarily underemployed.
The father next argues that the circuit court erred in imputing to him income of $500 per week because, the father says, no evidence was introduced that would tend to prove that he had ever earned more than $581 per month or was capable of earning more than $581 per month. We disagree.
With certain exceptions not here pertinent, Rule 32(B)(3), Ala. R. Jud. Admin., a portion of the rule governing child-support awards in Alabama courts, defines “gross income” with respect to proprietorship of a business as “gross receipts minus ordinary and necessary expenses required to produce such income.” However, when the father was directly questioned about the financial affairs of his corporation, a corporation whose financial records were necessarily within his own complete control, the father testified that he could not recall the corporation’s net income despite having prepared the corporation’s income-tax return himself. By doing so, the father conveniently placed the issues of the *575 corporation’s gross receipts and its necessary (and appropriate)[2] expenses beyond precise judicial determination.
Instead, the father flatly claimed that his own actual income was $581 per month. In doing so, he relied on a federal Form W-2 that the corporation had issued him (ie., that he had effectively issued to himself) stating his annual income to be slightly less than $7,000. However, even that claimed income figure was impugned by the father’s admission that his corporation had made payments towards his own credit-card accounts. Rule 32(B)(4), Ala. R. Jud. Admin., specifically provides that such expense reimbursements or in-kind payments are to be included in that parent’s income if they are “significant and reduce personal living expenses.” Moreover, the father has claimed monthly expenses that are greatly reduced by his current living arrangements.
To be sure, the mother adduced no direct evidence indicating that the father actually earned in excess of $581 per month. However, in order for the circuit court to properly determine that the father was voluntarily underemployed and to impute income to him accordingly, the mother was not required to prove the father’s actual earnings; rather, the mother was only required to demonstrate the father’s potential employment income. Although the circuit court was presented with limited evidence in this case, we have often recognized that it is the role of the trial court to observe witnesses and to assess their credibility. Smith v. Smith, 887 So.2d 257, 262 (Ala.Civ.App.2003); and Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App.1999). Moreover, we are not permitted to reweigh the evidence and substitute our judgment for that of the trial court. See Somers v. McCoy, 777 So.2d 141, 142 (Ala.Civ.App.2000).
In our view, the circuit court could easily have discredited large portions of the father’s testimony; that court could, within its discretion, have determined that the father’s claimed ignorance of the financial affairs of his own corporation was a smokescreen designed to deprive the circuit court of probative evidence from which it could determine a just child-support award. Among the evidence that the circuit court did have was that the father had been able to afford considerable outlays for the mother and her two children before the parties’ separation, whether taken from the corporation’s assets or from his own draw, but had stopped making support payments to the mother because the mother and her alleged paramours had “cheated” him out of money. The circuit court could have concluded from the totality of the evidence that the father and/or his corporation was earning more than the father’s stated income, and that court could properly have attributed that income, pursuant to Rules 32(B)(3), 32(B)(4), and 32(B)(5), to the father. Thus, we cannot conclude that the circuit court’s judgment as to child support, which is based upon evidence received ore tenus, is due to be reversed on the basis that it is unsupported by the evidence so as to be plainly and palpably wrong (see Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995)).

Visitation

The father also argues that the circuit court erred in omitting the visitation agreement from the judgment. In its brief on behalf of the mother, the State has declined to address this issue on the ground that, pursuant to § 38-10-7.1, Ala. *576 Code 1975, it does not represent the mother on this issue.[3] Moreover, the mother has not submitted a brief on her own behalf opposing the father’s argument on this issue.
While a trial court is not bound by an agreement of the parties regarding visitation, “compromises and settlements of litigation are favored by the courts of this state.” J.F. v. D.C.W., 896 So.2d 577, 581 (Ala.Civ.App.2004) (citing Junkin v. Junkin, 647 So.2d 797, 798 (Ala.Civ.App. 1994)). Moreover, the statement of the circuit court at the June 8, 2004, hearing that the parties’ visitation agreement would establish the visitation schedule indicates that the circuit court’s omission of a provision for visitation from the judgment was unintentional. Accordingly, we reverse the judgment insofar as it omitted a provision for visitation and remand the case to the circuit court with instructions to incorporate the parties’ visitation agreement into its judgment.

Conclusion

We affirm the circuit court’s judgment as to the issue of child support. As to the issue of visitation, we reverse the judgment and remand the case for the circuit court to incorporate the parties’ visitation agreement into its judgment.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, P.J., and THOMPSON and PITTMAN, JJ., concur.
BRYAN, J., concurs in part and dissents in part, with writing.
MURDOCK, J., dissents, without writing.

. " 'Bush Hog’ is the trade name of a large mower generally drawn by a tractor. The term 'bush hog’ is often used generally for such mowers and as a verb indicating the use of such mowers.” Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 963 (Ala. 1995) (Houston, J., concurring specially).

. The appropriateness of expenses claimed by a business owned by a parent is a determination left to the trial court’s discretion. See Holman v. Oakley, 595 So.2d 905, 907 (Ala. Civ.App.1992).

. Section 38-10-7.1 provides, in pertinent part, that any district attorney initiating a legal proceeding on behalf of a parent to enforce the parent’s right to child support cannot provide representation on issues other than child support.